IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 11-cv-01497-RBJ-KMT

DAVID K. JENNER,

    Plaintiff,

v.

CAPT. WILLIAM SOKOL (official capacity),
AMY COSNER (individual and official capacity),
TERESA REYNOLDS (individual and official capacity),
COLORADO DEPARTMENT OF CORRECTIONS (official capacity),

    Defendants.

## AMENDED ORDER

This case comes before the court on the Plaintiff, David K. Jenner's motion for summary judgment [docket #67], a cross-motion for summary judgment submitted by the defendants [#97], a motion for reconsideration of a previous order from this Court [#104], and a motion to change the first name of defendant Sokol [#118].

**Procedural History**

Mr. Jenner is an inmate housed at the Limon Correctional Facility (LCF) within the Colorado Department of Corrections (CDOC). Mr. Jenner originally brought two claims against the CDOC and several CDOC staff members for violating his rights under the First Amendment and the Religious Land Use and Institutionalized Person's Act (RLUIPA). The first claim alleged that Mr. Jenner's right to free exercise of religion was being violated because LCF was not holding Jewish Shabbat services at the proper time, was not allowing access to necessary materials for Jewish services, was not providing proper food for Jewish services, and was

1

allowing prisoners whose Jewish beliefs were not sincerely held to attend services. Based upon the recommendation of Magistrate Judge Tafoya [#32], this Court dismissed Mr. Jenner's claims that allowing prisoners whom Mr. Jenner deemed insincere to attend services violated his rights [#89]. The second claim, which alleged unlawful retaliation, has been dismissed entirely. The Court also adopted Magistrate Judge Tafoya's recommendation that claims for monetary relief against the CDOC defendants in their official capacities were barred by the Eleventh Amendment. Finally, the Court ruled that Amy Cosner and Teresa Reynolds were entitled to qualified immunity. Thus the remaining claims are that Mr. Jenner's rights under the First Amendment and RLUIPA have been violated by defendants' refusal to allow him access to items such as candles, a lighter to light the candles, pre-fast and break-fast meals for fasting periods, traditional foods, and Sukkoh materials; defendants' failure to call Shabbat services; and defendants' limitation that Shabbat services be held after dinner around 7:00 p.m.

**Facts**

LCF, the facility where Mr. Jenner is housed, is rated as a security level 4 facility, on a scale where 1 is the lowest and 5 is the highest. At LCF, CDOC attempts to meet inmates' religious needs through the use of Faith Groups. Offenders can declare a Faith Group (but can change Faith Groups no more than once a year) and through these Faith Groups they have access to a variety of accommodations to meet their religious needs.

Mr. Jenner has chosen to be part of the Jewish Faith Group. As a member of the Jewish Faith Group, Mr. Jenner attends Friday evening Shabbat services. During the Shabbat service candles are lit. According to Mr. Jenner, the candles must be lit no later than eighteen minutes before sunset. At LCF Shabbat services are called at 7:00 p.m. year round. During some parts of the year this conforms to the requirement that the candles be lit at least eighteen minutes before

sunset, but at other parts of the year the service starts after the sun has set. Mr. Jenner also complains that Shabbat services are after dinner, but according to his beliefs, he must attend services before eating. This forces Mr. Jenner to choose between skipping dinner and violating his religious beliefs. In addition to problems with the timing of Shabbat services, Mr. Jenner complains that services are frequently not called at all.

Mr. Jenner also complains that he cannot procure items that he needs to practice his religious beliefs. Specifically, Mr. Jenner has alleged that he cannot get candles, a lighter, wine or grape juice, and holiday supplies. These supplies are not allowed in individual cells, but can be purchased for use with faith groups. Mr. Jenner objects to having to purchase supplies for the entire faith group rather than for his individual use and claims that he has not been able to acquire these items at all.

### Summary Judgment [#67 and #97]

<u>Standard</u>

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008) (quoting Fed. R. Civ. P. 56 (c)). When deciding a motion for summary judgment, the Court considers "the factual record, together with all reasonable inferences derived therefrom, in the light most favorable to the non-moving party . . . ." *Id.* The Court does not weigh the evidence or make credibility determinations. *Id.* The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine

issue for trial." *Id.* at 324.  In challenging such a showing, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

When a case involves a *pro se* party the court will "review his pleadings and other papers liberally and hold them to a less stringent standard than those drafted by attorneys." *Trackwell v. U.S. Government*, 472 F.3d 1242, 1243 (10th Cir. 2007).  However, "it is not the proper function of the district court to assume the role of advocate for the pro se litigant." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  A broad reading of a pro se plaintiff's pleadings "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based…conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Id.*  Pro se parties must "follow the same rules of procedure that govern other litigants." *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (citing *Green v. Dorrell*, 969 F.2d 915, 917 (10th Cir. 1992)).

Conclusions

*Timing of Shabbat Services*

Mr. Jenner alleges that his rights under the First Amendment and RLUIPA are being violated because Shabbat services are not held until 7:00 p.m. or later on Friday evenings and at certain times of the year this is too late to properly light the Shabbat candles.  According to Mr. Jenner, in the Orthodox Jewish faith, Shabbat is a day of rest that requires refraining from work activities.  Shabbat is observed from a little before Sunset on Friday evening until Saturday evening.  Mr. Jenner explains that because Shabbat is a day of rest, the Shabbat candles must be lit before sundown on Friday evening, specifically they are to be lit between one and a quarter hours and eighteen minutes before sunset.  When services begin at 7:00 p.m. or later, it is

sometimes already dark.  Further, Mr. Jenner explains that he must perform a portion of the Shabbat service before eating, and because dinner is served before the Shabbat service he is forced to choose between eating dinner and exercising his religious beliefs.

"Under the First and Fourteenth Amendments, inmates are entitled to the reasonable opportunity to pursue their sincerely-held religious beliefs.  What constitutes a 'reasonable opportunity' is determined in reference to legitimate penological objectives." *Gallagher v. Shelton,* 587 F.3d 1063, 1069 (10th Cir. 2009).  A two part test is applied when analyzing a claim under the First Amendment.  "[T]he prisoner-plaintiff must first show that a prison regulation 'substantially burdened ... sincerely-held religious beliefs.'" *Kay v. Bemis*, 500 F.3d 1214, 1218-19 (10th Cir. 2007) (quoting *Boles v. Neet,* 486 F.3d 1177, 1182 (10th Cir.2007)).  Next, "prison officials-defendants may 'identif[y] the legitimate penological interests that justif[ied] the impinging conduct.'"  *Id.* (quoting *Boles,* 486 F.3d at 1182).

Thus, the first inquiry is whether Mr. Jenner's beliefs are sincerely held.  The defendants have not argued that Mr. Jenner's beliefs are not sincerely held.  Further, "'[t]he inquiry into the sincerity of a free-exercise plaintiff's religious beliefs is almost exclusively a credibility assessment, . . . and therefore the issue of sincerity can rarely be determined on summary judgment . . . .'" *Id.* (quoting *Snyder v. Murray City Corp.* 124 F.3d 1349, 1352-53 (10th Cir. 1997).  Thus, for purposes of this analysis, the Court assumes that Mr. Jenner's beliefs are sincerely held.

Next, the Court must determine if Mr. Jenner's beliefs are "substantially burdened."  The defendants argue that they consulted with a rabbi who determined that having Shabbat services on Friday nights at 7:00 p.m. would be sufficient to meet Orthodox Jewish prisoners' religious needs. Williams Aff. ¶ 23.  In some circuits the First Amendment substantial burden analysis

5

requires a showing that Mr. Jenner's beliefs are a "central tenet" of the religion. *Freeman v. Arpaio,* 125 F.3d 732, 737 (9th Cir. 1997) ("In order to reach the level of a constitutional violation, the interference with one's practice of religion must be more than an inconvenience; the burden must be substantial and interfere with a tenet or belief that is central to religious doctrine.") (internal quotation omitted). In *LaFevers v. Saffle*, 936 F.2d 1117, 1119 (10th Cir.1991), the Tenth Circuit acknowledged that other circuits require that a prison regulation must interfere with a "central" tenet or belief of a religion before a prisoner can state a constitutional claim. *Kay v. Bemis*, 500 F.3d 1214, 1220 (10th Cir. 2007). However, "[t]he Tenth Circuit does not follow this rule." *Id.* The court held that "a prisoner's belief in religious dietary practices is constitutionally protected if the belief is 'genuine and sincere,' even if such dietary practices are not doctrinally 'required' by the prisoner's religion. 'Sincerely held' is different from 'central,' and courts have rightly shied away from attempting to gauge how central a sincerely held belief is to the believer's religion." *Id.* (quoting *Watts v. Fla. Int'l Univ.*, 05-13852, 495 F.3d 1289, 1295 (11th Cir. 2007)). Thus, in this Circuit it is not relevant whether a rabbi determined that it was permissible to light the Shabbat candles outside of the window Mr. Jenner describes. As long as the belief is sincerely held and genuine the practice is protected. Thus, Mr. Jenner has alleged sufficient facts for the first prong of analysis.

Next, the analysis considers what penological interests this policy furthers. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89 (1987). To determine if penological interests justified the policy, the four factors set forth in *Turner v. Safley* are applied. These factors are: (1) whether a rational connection exists between the prison policy and a legitimate governmental interest advanced as its justification; (2) whether

alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights. *Id.* at 89-91.

The defendants argue that the important penological interests of safety and security are furthered by only allowing the Shabbat services to be held after dinner around 7:00 p.m. The defendants have explained that the prison is operated on a controlled movement schedule and that there is a count that occurs daily at 4:15. The count is necessary to make sure all prisoners are accounted for. After the count, the evening meal service begins about 5:00 p.m. Meal service is a delicate time at LCF because as many as 150 inmates may be eating at one time and there are many inmates moving about the facility between their cells and the dining room. This increases the risk of assaults, fights, riots, and the exchange of contraband. As a result, the defendants explain that meal time requires extra security personnel. The defendants argue that if the Shabbat service was called earlier than 7:00 p.m. then it would interrupt either the count or the meal time. This satisfies the first prong that there is a rational connection between the prison policy and a legitimate penological need.

The second *Turner* factor is whether there is an alternative avenue for expressing the constitutional right that the prison policy impedes. At LCF inmates can practice their faiths individually in their cells as well as in faith group services. Certain religious supplies, including candles, are not permitted in cells for individual worship. Through the Jewish faith group, LCF offers Shabbat services as well as services for Jewish holy days including Passover, Rosh Hashanah, and Yom Kippur. Faith Groups Overview at 6. Thus, Mr. Jenner can practice many tenets of his Jewish faith on his own or with the Jewish faith group. However, outside of faith

group services Mr. Jenner is not permitted to light candles. Therefore, at certain times of the year, Mr. Jenner does not have an opportunity to light Shabbat candles before sunset.

The third and fourth *Turner* factors can be analyzed together. The third factor requires analysis of the affect the accommodation would have on the guards and other prisoners and the fourth factor requires analysis of whether there are readily available alternatives to the restrictive policy. Defendants argue that accommodating Mr. Jenner and other inmates to allow for Shabbat services that begin earlier depending on the time of the year would have a negative effect on the guards and other inmates because it would interrupt LCF's controlled movement schedule and jeopardize LCF's ability to complete the 4:15 count and the evening meal. Because the meal is such a big undertaking, LCF argues that it does not have sufficient security staff to supervise a Shabbat service as well as the meal.

However, Mr. Jenner points out that on Saturdays inmates belonging to the Native American and Islamic faith groups are permitted to have their faith group services during the lunch meal time. Those faith groups are served the lunch meal during their faith group services. Counts are held several times per day: 1:00 a.m., 4:00 a.m., 11:10 a.m., 4:15 p.m., and 9:45 p.m. Williams Aff. at ¶ 9. The 4:15 p.m. and 9:45 p.m. counts are "standing counts." *Id.* at ¶ 10. The defendants have not explained the difference between a standing count and the other counts. Mr. Jenner argues that because LCF is able to "out count" the Native American and Islamic inmates to attend services during a meal time, LCF should be able to do the same for Jewish inmates. The Defendants have failed to explain why they are able to "out count" inmates on Saturdays to attend services during lunch, but are not able to "out count" Jewish inmates on Friday evenings to attend services before or during dinner. Accordingly, a fact dispute exists as to what the effect would be on the guards and other inmates to allow the Jewish prisoners to attend Shabbat

8

services before 7:00 p.m. and whether an "out count" is a readily available alternative. Accordingly, summary judgment is denied as to the timing of Shabbat services.

In addition to his First Amendment claim, Mr. Jenner also argues that his rights were violated under RLUIPA. RLUIPA provides that "no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the government shows that the burden furthers "a compelling governmental interest" and does so by "the lease restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). The defendants have shown that there is a compelling governmental interest in safety and security at LCF. However, as explained above, Mr. Jenner has provided enough facts to create a genuine fact dispute as to whether it is possible for defendants to do an "out count" and release Jewish prisoners before 7:00 p.m. to participate in their Shabbat service. If this is possible, restricting Shabbat services to after the count and meal service would not be the least restrictive means of completing the count and ensuring safety and security at LCF. Accordingly, summary judgment for Mr. Jenner's claim under RLUIPA in relation to the time of Shabbat service is denied.

*Calling Shabbat Services*

Next, Mr. Jenner alleges that his rights have been violated because Shabbat services were regularly cancelled. The defendants explain that these services were cancelled occasionally when LCF was in lockdown or because of other security breaches. Mr. Jenner has provided Programs Participation Rosters for Jewish Services [#68, pg. 74-90], hundreds of pages of Master Control Sheets [#68, pp. 195-504], as well as a list of all of the times in 2011 Jewish faith group services were not called. According to Mr. Jenner, in 2011, Jewish faith group services were not called 22 times, not including services that were not called for the Sukkot holiday. In response to an interrogatory question about why Jewish services "were repeatedly not called for

the past two years," Mr. Sokol responded that "Cancellations of religious programs and other programs sometimes occur, but such cancellations are usually, if not always, due to a safety and security need." Sokol Inter. #12.

"[G]roup religious experience is basic to an inmate's First Amendment rights," however, "group religious practice may be curtailed or prohibited for security reasons." *Termunde v. Cook*, 684 F. Supp. 255, 261 (D. Utah, 1988). Thus, this Court analyzes Mr. Jenner's claim under the same two step inquiry discussed above. First, the Court examines whether cancelling the services substantially burdens a sincerely held religious belief. *Kay,* 500 F.3d at 1220. There is no challenge that Mr. Jenner's belief is sincerely held. A religious exercise is substantially burdened when government prevents participation in conduct motivated by a sincerely held belief. *Abdulhaseeb v. Calbone,* 600 F.3d 1301, 1315 (10th Cir. 2010). In 2011 services were cancelled 22 times. This is more than a temporary or fleeting inconvenience, but rather a frequent occurrence where Mr. Jenner could not attend group services. Accordingly, he has shown that the policy was a substantial burden on sincerely held religious beliefs.

Next, the restriction of services must be compared to the penological justifications. *Kay,* 500 F.3d at 1220. Many courts have recognized that safety and security are important penological interests. Rather than applying strict scrutiny, regulations are valid if they are "reasonably related to legitimate penological interests." *Turner,* 482 U.S. 78, 89 (1987). This standard is necessary so that prison administrators rather than courts can "make the difficult judgments concerning institutional operations." *Id.* (quoting *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 128 (1977)).

Despite this more deferential standard, general or vague statements about security are not sufficient to justify the denial of constitutional rights. *See e.g. Cleavinger v. Saxner,* 474 U.S.

10

193, 207 (1985) ("It is the business of prison officials, of course, to maintain order within their institutions. But this fact does not support a claim that every step taken to protect constitutional rights of prisoners will lead to a breakdown in institutional discipline and security. Routine and automatic arguments to this effect have been made before and have been rejected by this Court.) "It is critically important then that the record reveal the manner in which security considerations are implicated by the prohibited activity. . . . the governmental interest asserted in support of a restrictive policy must be sufficiently articulated to allow for meaningful review of the regulation in question and its effect on the inmate's asserted rights." *Caldwell v. Miller*, 790 F.2d 589, 597-98 (7th Cir. 1986).

The defendants have not provided sufficient information to determine whether frequent cancellation of the services was reasonably related to safety, security, or other legitimate penological interests. The only explanation is that cancellations are usually due to a safety or security need. This is not enough detail to analyze the restriction under the *Turner* factors. Accordingly, summary judgment for Mr. Jenner's First Amendment claim about the cancellation of Shabbat services is denied.

RLUIPA requires the government to use the least restrictive means to obtain a compelling government interest. 42 U.S.C. § 2000cc-1(a)(1)-(2) For the reasons already described, the defendants did not provide enough information to determine if the security interests that led to cancelling services were the least restrictive means available. Accordingly summary judgment for Mr. Jenner's RLUIPA claim as it relates to the cancellation of services is also denied.

*Availability of Religious Supplies*

Mr. Jenner's final claim under the First Amendment and RLUIPA is that his civil rights were violated because he could not get supplies necessary for his religious needs. Specifically, Mr. Jenner complains that (1) he can only buy religious supplies for the Jewish faith group and not for his individual use; (2) grape juice is priced too high in the canteen so that it cannot reasonably be purchased for services; and (3) he is not able to procure candles, a lighter, or holiday items.

At LCF certain faith items are available for inmates to purchase for their individual use, but many items must be purchased for the entire faith group. For example, the Jewish faith group is permitted to have candles, a lighter, and grape juice in their faith group property, but individuals are not permitted to possess those items. Faith Groups Overview at 6. Instead, the items are kept in the faith group box which is kept secure and pulled out for use during Jewish faith group services. To acquire items for the faith group, an inmate must donate money to the general fund and then those funds are used to procure supplies for the faith group. Once an inmate donates money, the money no longer belongs to him, it belongs to the general fund. Similarly, once items are procured for the faith group they belong to LCF.

Mr. Jenner objects to this policy which requires him to buy items for the entire faith group rather than for his individual use. Under both the First Amendment and RLUIPA an inmate must show that the policy substantially burdens a sincerely held religious belief. *McKinley v. Maddox,* No. 11-6263, 2012 WL 3292389, at *5 n.4 (10th Cir. August 14, 2012). There is a substantial burden if the government: "(1) requires participation in an activity prohibited by a sincerely held religious belief, or (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent either not to

engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief." (*Abdulhaseeb,* 600 F.3d at 1315) (*McKinley,* 2012 WL 3292389, at *5 n.4) (extending *Abdulhasseb's* definition of substantial burden beyond RLUIPA claims to also cover First Amendment claims).

The policy requiring that certain religious supplies be bought for the entire faith group does not require participation in violation of Mr. Jenner's religious beliefs, nor does it prevent participation in conduct motivated by his religious beliefs. It is a closer question whether it places substantial pressure on Mr. Jenner not to engage in the conduct. For items that are not consumptive, it would not matter whether the item belongs to the faith group or to the inmate personally. For example, the same number of Shabbat candles would be lit whether there is one person or twenty people present at the Shabbat service. Thus, the policy does not put pressure on Mr. Jenner not to participate in the religious practice. However, items that are consumed by individual faith group members during a service are more problematic. Mr. Jenner argues that instead of purchasing grape juice for his own consumption, he is required to purchase grape juice for the group, greatly increasing the cost of having grape juice available at all services. Mr. Jenner points to the records that show 51 members in the Jewish faith group. The Court agrees that if Mr. Jenner were forced to provide weekly grape juice for 51 people this might put substantial pressure on him not exercise that portion of his religious beliefs. However, based on the records that Mr. Jenner supplied, most Shabbat services were attended by only two people: Mr. Jenner and James McDaniel. Occasionally a third person would be present and on Passover, the roster shows 5 people. Programs Participation Roster for Jewish Services, #68, pp. 74-90. Based on these records, Mr. Jenner is not forced into the difficult position of having no grape juice or supplying grape juice to a crowd. Instead, grape juice that Mr. Jenner purchases through

the general fund for use by the Jewish Faith Group would most likely be consumed by him and one or two other people. Therefore, this policy does not substantially burden Mr. Jenner's religious practices.

Next, Mr. Jenner argues that grape juice is too expensive in the canteen to be able to purchase it for services. However, since his complaint was filed, Mr. Jenner submitted a grievance on May 7, 2012 complaining that many of the supplies that he ordered had not arrived. The one supply that had arrived was grape juice. Accordingly, this complaint is now moot, Mr. Jenner was able to procure grape juice for Jewish faith group services.

Finally, Mr. Jenner argues that he has not been able to procure supplies that are necessary for his Jewish services. Among the items that Mr. Jenner complains that he cannot get are a lighter, candles, and holiday items. At LCF, inmates are permitted to purchase faith items through the canteen or through pre-approved vendors. There are currently four approved vendors for Jewish faith items. Mr. Jenner complains that the current approved vendors are inadequate and he has not been able to add new vendors to supply him with these items. To add new vendors an inmate must fill out the proper form and a background check must be performed. Only permitting approved vendors to supply prisoners with faith items is not a substantial burden. Controlling which vendors can supply inmates with supplies does not prevent the inmates from practicing their faith or put substantial pressure on the inmates not to practice their religion. Mr. Jenner has not argued that the approved vendors do not have the necessary supplies. Rather he argues that the approved vendors are too expensive or do not have the right items in stock. For example, in his May 7, 2012 grievance, Mr. Jenner argues that his money was stolen because he has not received all of the faith items that he ordered. LCF explains that the items are on back order because they were ordered at busy times of the year. Although it is

frustrating that a vendor may have necessary items on back order, it does not rise to a substantial burden that the government is placing on religion. Rather it is merely an inconvenience that inmates must order supplies well in advance, try another one of the four approved vendors, or use the appropriate forms to request a new vendor. Because Mr. Jenner has not presented facts to show that he cannot acquire the needed faith items, but rather that he must go through preapproved vendors, he has not shown that there is a substantial burden on his religious practices. Mr. Jenner has not established a substantial burden in acquiring faith items, and thus, summary judgment for the defendants is appropriate.

*Equal Protection Claim*

To state an equal protection claim, Mr. Jenner must allege that the government treated him differently than other similarly situated individuals. In his complaint, Mr. Jenner acknowledges that he is bringing claims under the First Amendment, RLUIPA, and the Equal Protection Clause. However, Mr. Jenner did not make any allegations that he was treated differently than other similarly situated individuals. Although a pro se plaintiff's filings are construed liberally, a broad reading of a pro se plaintiff's pleadings "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based…conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Mr. Jenner has not alleged sufficient facts to state a claim for equal protection and thus the defendants are entitled to summary judgment.

**Motion to Amend or Alter June 19, 2012 Order [#104]**

On April 17, 2012 this Court issued an order [#89] adopting Magistrate Judge Tafoya's recommendation that defendants' motion to dismiss be granted in part and denied in part. On

June 19, 2012 this Court issued another order [#103] adopting Magistrate Judge Tafoya's recommendation denying Mr. Jenner's request to amend his complaint outside of time limitations. Mr. Jenner asks the Court to resolve whether his amended compliant should be dismissed and whether his supplemental claim survives.

First, contrary to Mr. Jenner's statements, Magistrate Judge Tafoya did not permit Mr. Jenner to amend his complaint. In her recommendation on April 5, 2012 [#80] the magistrate judge recommended that Mr. Jenner not be granted leave to amend, and this Court adopted that recommendation in the June 19, 2012 order [#103]. Mr. Jenner's amended complaint was stricken [#48 and #54]. Further, this Court cannot find Mr. Jenner's supplemental claim. Only those claims which were plead in his complaint [#1] will be considered.

Mr. Jenner now asks for reconsideration of the order dismissing some of his claims arguing that his objections to the magistrate judge's order were submitted but not received. The Court did not receive any objections to the recommendation and still has not received objections to the recommendation. "In the absence of timely objection, the district court may review a magistrate . . . [judge's] report under any standard it deems appropriate." *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991). This Court reviewed Magistrate Judge Tafoya's recommendation and determined that it was reasonable and supported by the record. Because Magistrate Judge Tafoya and this Court have both already analyzed this issue, the Court declines to amend or alter its June 19, 2012 order.

**Motion to Change Name of Defendant Sokol [#118]**

Mr. Jenner has filed a motion requesting to change the name of Defendant Sokol from Captain William Sokol to Sgt. Kenneth Sokol. Mr. Jenner explains that Mr. Sokol's job responsibilities have changed so that he is now a sergeant rather than a captain. Also, Mr. Jenner incorrectly listed Mr. Sokol's first name as William rather than Kenneth in previous filings. All of the records suggest that Mr.

Sokol knew that he was a defendant in this case. Because this change should not prejudice defendants in any way, the motion is granted.

**Order**

1. Plaintiff's motion for summary judgment [#67] is DENIED.

2. Defendants' motion for summary judgment [#97] is GRANTED IN PART and DENIED IN PART consistent with this order.

3. Plaintiff's motion for reconsideration [#104] is DENIED.

4. Plaintiff's motion to change the name of defendant Sokol [#118] is GRANTED.

DATED this 11th day of February, 2013.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge